## McBRIDE *v.* SCOTT.[1]

1. NEGLIGENCE—PERSONAL INJURIES—FALLING BUILDING—DECLARATION—DEMURRER.

   A declaration in an action for injuries received by the collapse of a building alleged to have been caused by defendants' negligence, which states that many persons were killed and wounded, among whom was the plaintiff, but which contains other allegations stating that he was injured, is not subject to demurrer as showing that plaintiff is dead.

2. SAME—PROPRIETORS—SEVERAL INTERESTS.

   A declaration in an action for injuries received by the collapse of a building alleged to have been caused by defendants' negligence, which shows that several of the defendants owned the property, and attempted to erect a building thereon, and the collapse of the structure, is not subject to demurrer because it does not show the respective interests of such defendants.

---

[1] Rehearing denied April 30, 1901.

3. SAME—JOINT LIABILITY.

> The owner of property who contracts for the construction of an obviously defective and dangerous building, the architect thereof, and the various contractors who participate in the defective work may be made joint defendants in an action for injuries received by the collapse of the building.[1]

Error to .Wayne; Frazer, J. Submitted October 5, 1900. Decided January 29, 1901.

Case by Joseph McBride against John Scott, Arthur M. Scott, and Maxwell H. Grills, doing business as John Scott & Co., James H. Moore, Enoch W. Wiggins, Alexander Chapoton, and James M. Wood, impleaded with others, for injuries received by the collapse of a building. From a judgment for defendants on demurrer to the declaration, plaintiff brings error. Reversed.

*S. E. Engle*, for appellant.

*Earl D. Babst* and *Otto Kirchner*, for appellees John Scott & Co.

*Brennan, Donnelly & Van De Mark*, for the other above-named appellees.

MOORE, J. The plaintiff commenced suit against defendants by declaration. Some of the defendants pleaded thereto. Others of them demurred to the declaration. The circuit judge sustained the demurrer. The case is brought here for review by the plaintiff. The declaration is very long. We insert here only a portion of it, but enough to answer the purposes of the inquiries involved:

"Joseph McBride, the plaintiff herein, by Seth E. Engle, his attorney, complains of James H. Moore, John Scott, Arthur. M. Scott, Maxwell H. Grills (the last three doing business under the style John Scott & Co.), Enoch W. Wiggins, Col. J. M. Wood, Richard J. Thompson, Geo. O. Muhlfeld, Alphonse De Man, and Florimond De Man (the last two copartners as De Man Bros ), William

---

[1] As to individual liability for falling walls or buildings, see note to *Ryder* v. *Kinsey*, (Minn.) 34 L. R. A. 557.

Reich, Alexander Chapoton, Edward Schmitt, Clara S. Scherer, and the Peninsular Engineering Co., a corporation existing under the laws of, and doing business in, Michigan, having its office in the city of Detroit, and J. C. Dantziger, A. A. Cowles, F. A. Goodrich, and William Gerhauser, members of said corporation, in an action of trespass on the case, filing this declaration and entering a rule to plead as commencement of suit.

"For that whereas, heretofore, to wit, before the 5th of November, 1898, the date of the culmination of the grievances hereinafter complained of, there was and had been in the city of Detroit, on Monroe avenue, near Campus Martius, a parcel of ground in which said James H. Moore, and Enoch W. Wiggins, as his agent and manager and attorney in fact, had a proprietary interest, to wit, the ownership by land contract, or of a term of years therein, or otherwise, and the said Edward Schmitt and Clara S. Scherer had also a proprietary interest, to wit, the ownership of the fee thereof beyond the contract or term of years or otherwise; and that the said James H. Moore and his agent, said Wiggins, under a power of attorney, with the consent and concurrence of said Schmitt and Scherer, for expected revenues and profits to be derived therefrom to themselves respectively, proposed to erect upon said property a building for amusement purposes, including a theater with a large stage and auditorium, the roof over which stage and auditorium should be supported by material extending in a span from wall to wall, across the auditorium and stage, from side to side transversely over the path of the entrance from Monroe avenue; the entire building, including the roof, to be fireproof; the roof to be of great height from the ground, to wit, about or upwards of 100 feet, and the span of the supports to be very long, to wit, about 73 feet; the trusses bridging said span, and the very high trestlework frame, to wit, of about 100 feet from the ground, resting upon the trusses and extending up to and supporting the roof, and the framework of the roof itself, all to be composed of steel, and the panels of the roof frame to be filled with some kind of suitable concrete, cement, and the like, the surface extending sufficiently above the steel framework to make a connected, continuous, smooth-surface cement roof, to be covered with an ordinary tar and gravel roofing; said trusses so spanning the building, and supporting the entire steel-frame trestlework above them, together with the roof

resting thereupon, to have no supports underneath except by said brick side walls, respectively, at each end of the trusses.

"The danger arising from such a building, both when completed and while in the course of construction, is, was, and must have been, to competent artisans, obvious, unless planned and executed with great skill, care, and experience in that kind of construction, it not being a building of steel framework from the foundation up, but, instead thereof, merely brick walls, which walls alone were to support at a great height, to wit, of 80 to 90 feet, the whole of said high, tall, steel construction, together with the ceiling and fixtures attached beneath, and the roof upon the top. It was and must have been evident to competent architects and engineers that such walls required the utmost strength, firmness, durability, and perfect adaptability in order to support, at so great a height, the adequate and necessary steel work for the purpose aforesaid; and it was and must have been in like manner obvious that the said extensive and tall steel trusses and trestlework, so resting upon mere walls at such height, required such strength, adaptation, rigidity, and firmness as to rest and remain quiescent upon the walls supporting it, as well as to safely sustain at the same time, in a like quiescent state, the great weight, not only of the roof, together with the framework itself, but such increment of load as might arise from other causes,—as the elements, falling snow, etc.; and that, unless said walls and said steel work and roofing were of proper material, dimensions, construction, and workmanship, it was obvious that great danger would and must impend over those who might occupy the building when completed, or who might be engaged on or about the premises during its construction, by reason of inevitable tendency to topple, sway, bend, twist, and warp out of alignment, out of plumb, and from proper bearings and position, resulting in total collapse.

"In the course of the construction of said building, heretofore, to wit, on the 5th day of November, 1898, the roof being just nearly or quite completed, the roof and walls and the steel framework collapsed and fell all together in a mass of *debris*, wounding and killing many engaged thereon and about the premises, among whom was the plaintiff, receiving the injuries hereinafter set forth.
* * *

"Third Count. And for that whereas, the said four proprietary defendants, proposing to erect the theater aforesaid, of the size and general plan in the first count set forth, they employed the said John Scott & Co. as their agent to supervise, inspect, and carry forward said enterprise, and made said John Scott & Co. the general supervisors thereof and their agent therein; and they further employed, and allowed to be employed, the other defendants, as in said first count mentioned, to carry forward the other respective parts of the structure, ·as in said first count stated, and retained the control over them, and the right to control, supervise, and direct as to the work, materials, manner, method, and details of construction to the completion thereof, through their agent, the said John Scott & Co., whom they made their agent for that purpose; and their said agent, John Scott & Co., and their other employés, were each and all negligent in producing such a defective structure, not only as in said first count stated, but also as more fully hereinafter in this count set forth; and the said J. M. Wood participated and contributed, and was allowed to participate and contribute, to the grievances aforesaid as in said first count stated.

"In addition to the neglect of duty on the part of the various defendants, and their defective work, as already set forth in the first count, and made a part hereof by reference thereto, the plaintiff avers the neglect of duty on the part of the several defendants so employed and permitted to be employed by said proprietors, and to participate and to be engaged in said enterprise, and to conduct the respective parts thereof, as follows: It was the duty, under the circumstances, of John Scott & Co. to exercise and apply skill and diligence in the inspection of said plans, and to ascertain and to know and to understand the defects and dangers thereof, if any, and to point out such defects and dangers, and to give warning against them, and to refuse to proceed or to allow such a structure to be built until such defects and dangers should be corrected and removed; and plaintiff avers that in this respect the said John Scott & Co., the agent selected by the proprietors aforesaid, wholly and fatally neglected said duty on their part, and raised no objection, gave no warning, pointed out no defects, but deliberately, negligently, and recklessly proceeded with the construction of said building upon the plans selected by the proprietors, and adopted by them as aforesaid. The plaintiff avers that said plans were defec-

tive, and among their defects he proceeds to point out, so far as he is able at the present time, the main ones:

"He avers that the plans and specifications as a whole were such as would produce a structure weak, frail, and liable to collapse, and therefore extremely dangerous; that the roof, being of the dimensions of about 67 by 73 feet, consisting of heavy material, to wit, cakes of concrete laid in the panels of the steel framework, was too heavy, and of such great weight that the trusses and trestlework supporting it from beneath were insufficient, and the structure was top-heavy and toppling; that the trusses were insufficient in number; that the span of the trusses, being about 73 feet from wall to wall, should have been increased in number, and whereas only two trusses were used to span the auditorium, more should have been used; that the upper and lower girders of the trusses were too small and thin in dimensions, and therefore too weak; that steel material for such girders of the same pattern and depth of beam are manufactured in different degrees of strength and sectional area by increasing their thickness, and they are manufactured in several different and higher degrees of strength simply by increasing their thickness, and the thicker and stronger ones are the safer without occupying any more perpendicular space when in use, but they are more expensive on account of their increased thickness, weight, and strength; that in this case the thicker, heavier, and stronger material for the truss girders was not used, but the thin and weak, to wit, the thinnest, weakest, and cheapest that was manufactured of that depth of beam; that the other parts of said trusses were in like manner too thin, weak, and frail.

"Channel bars entered into the construction of said girders and parts of said steel work. A channel bar may be generally described as the half of an I beam bisected vertically; and, to obtain the greatest strength in making a girder of two channel bars parallel and their backs toward each other, they should be placed not within nor beyond certain limited distances from each other; but in placing these channel bars they were placed at an improper distance, to wit, the backs too near each other, and thereby the maximum strength of the girders greatly and dangerously reduced. In other respects the said trusses and the various parts thereof were improperly, negligently, and dangerously adjusted, fitted, and constructed.

"That the workmanship upon the trusses themselves

was in some important respects bungling, and a botch work, as the parts not properly fitting, the holes through which adjacent parts were to be riveted or bolted together not meeting each other, and the iron was hammered, gouged, drawn, and weakened in the effort to get the bolts or rivets through them; and when thus bolted or riveted, the holes being enlarged and irregular, and the joints defective, the structure was not firm and safe, but loose, and the parts so jointed liable to slip and work past each other, especially under a great strain, and not only to weaken the trusses themselves by so loosening, but, by such weakening and loosening, liable to cut the bolts or rivets, thus disconnecting such parts of said trusses entirely. Some of the holes where the adjoining parts should have been bolted or riveted 'were left open, not being fastened or bolted together at all. These trusses, from the bottom to the top girders, were about 15 feet in height, and spanning a space of about 73 feet between the walls, and extending onto and through said walls, were about 75 or 76 feet in length, and, being of such height and such length, and so bunglingly constructed, they were extremely frail, and liable to warp and twist out of plumb and out of line, presenting the appearance, to some extent, of an old rail fence; and they did, while in the course of construction, so warp and twist both out of alignment and out of plumb; and notwithstanding it was and must have been obvious to a competent supervisor of the work that the least departure from correct lines would be extremely dangerous, and certain to lead to further departure under the inevitable, constant pressure, that a total collapse must inevitably follow, and yet, without correcting these errors, or attempting to do so, the work was negligently allowed to proceed.

" These trusses, being thus 15 feet or more in total height, and of the length aforesaid, according to the plans and specifications, were without any adequate lateral support, whereas on account of their length and height, and bearings only at the ends, it was and must have been evident to a competent ·supervisor that thorough lateral supports were absolutely necessary in order to keep them in alignment and plumb, and especially as the cross-girders supporting the roof beams did not rest directly on the top girders of the trusses. Upon the tops of these precarious trusses without lateral supports, instead of laying or fastening the cross-beams or girders, which would,

to some extent, have furnished lateral support, a most reckless and dangerous construction was contemplated by the plans. Resting upon those two frail trusses were steel upright studs or struts, so called, and extending to the height of about 7 feet, the trusses being a great distance apart, to wit, about 21 feet, and the struts upon each truss being 12 feet apart, and on the top of these tottling supports were extended, at right angles to the trusses across the building, from the Monroe-avenue front to the rear, the steel girders; and these carried the roof beams crossing them at right angles, upon which roof beams the concrete was to be laid. Thus the trusses, with the struts resting upon them, were liable, without proper lateral support, to warp, twist, and sway one way or the other, to the right or to the left, so that the struts and trusses, instead of remaining in the same perpendicular plane, would, at their points of juncture, form an angle, practically removing all sufficient support intended by the truss to sustain the uprights, and, through them, the roof.

"The plaintiff avers that this defect was of such a glaring, negligent character as to be inconceivable except in the most wanton recklessness or imbecility; and, to guard against this extreme danger in the want of lateral support to the trusses themselves and the struts upon them, only the most inadequate, futile, childish provisions were made, to wit, short, inefficient bracings at the top of the struts, where least needed and of the least use, instead of properly bracing the trusses where bracings were most needed, and where they might have been more efficient, and would have been, if adequate in themselves. The braces were not needed at the top, because the top of the said struts could be held in place by fastenings to the girders which they carried; and, besides being improper in design and location, they were too short and weak to sufficiently support the lower end of the strut in case of the swaying of the truss from its alignment or plumb. Besides, these braces were prepared as though the roof had been horizontal, instead of, as it was, sloping at an angle, the braces being of the same length for use on the side of the truss where the roof was lower as on the opposite side, where the roof was higher; and the braces were tampered with, bent, gouged, bungled, and weakened for the purpose of thus using them when not properly fitted, adjusted, and efficient to be used.

"Not only was there great and inevitable danger that

such a structure could not long endure, and that it must, from its inherent weakness and inability to support its own weight, therefore sooner or later begin to warp, sway, twist, and yield under the pressure, but in fact, before its completion, and while in the course of construction, it did and had begun to warp, twist, and bend out of plumb and out of alignment, and partially yield and give way; and these occurrences were open and visible, and easy to be detected by the eye of the diligent artisan or supervisor; but nevertheless, through neglect of the said artisans and supervisors, the work was allowed to proceed, and the weight continued to be negligently piled upon the top of the top-heavy structure, without correcting or attempting to correct said obvious defects or to remove said danger.

"The means of supporting the panels of concrete work while being placed and while hardening were bunglingly defective, unskillful, and were dangerous, because so constructed as not to be removable after their purposes were accomplished without the exertion of great force and the shock of heavy blows. These temporary supports were constructed by fitting pieces of weak scantling between the roof beams. The ends of the scantling rested upon the lower flanges of the roof beams, the scantling being about one and a half feet apart, upon which planks were laid, making a temporary flooring to support the concrete until it should become hard and solid, supporting itself by its bearings upon the roof beams forming each panel respectively. In removing this temporary wooden support so that the roof should consist only of fireproof material, those pieces of scantling, being tightly held between said iron flanges, and the boards beneath the concrete resting upon it, were knocked out by heavy and powerful blows, which was a most dangerous treatment of this most dangerous and toppling structure, and it was in ripe condition to cause the calamity under such treatment at that time,—a calamity already culminating, and which inevitably must have soon resulted, without the blows, from the frailty of the structure and the weight put upon it. Some days before the removal of the temporary support was begun, as aforesaid, the roof had already been sagging by reason of the frailties of the structure aforesaid; and yet a further coating and weight of concrete was negligently placed thereon, greatly adding to the weight of the roof, which must soon have collapsed had it not been added.

"The walls and the plans thereof were defective, not being of sufficient thickness and dimensions to support the weight of a proper roof, or as intended by the plans to be put upon it. The plans did not contemplate the strengthening of the walls by buttresses, or by combining with the brick any other constructive material, such as steel, or iron, or stone work constructed therein and combined with the brick walls in order to hold, bind, brace, and support them, which should have been done in order to carry safely so great a weight at such a height in the walls. The immediate supports placed in the walls for the bearings at the ends of the trusses were insufficient in quality and dimensions to sufficiently distribute the strain from the weight and pressure of the trusses most thoroughly and symmetrically throughout the walls, but leaving such strain and pressure mostly in the vicinity of the bearings, thus giving it the crushing, bending, bulging effect upon the walls, which they could not, as planned and built, sufficiently resist.

"And the said supervisors and agents, John Scott & Co., were in duty bound to object and protest against these various defects in the plans, and to refuse to proceed to erect a building in accordance with and involving such dangers; but they negligently violated said duty, made no protest, but carelessly and negligently went on with the work in the manner aforesaid; and they were also negligent and careless in their inspection of the workmanship, by means whereof it became still more defective and dangerous as aforesaid.

"It was also the duty of the other defendants, in their respective spheres, to object and protest against the plans, involving the defects and dangers aforesaid, and to refuse to contribute or to participate in or to aid in bringing about such dangers, surely tending to a catastrophe such as actually resulted; but they negligently proceeded and participated in and aided to bring about the result herein set forth, to wit, the said Chapoton proceeded to erect the walls, defective as aforesaid, and with defective material, lacking in adhesiveness and strength; and said defendants connected with and carrying forward the steel work as aforesaid should have protested against the defects and deficiencies in the plans, and refused to go on with such dangerous structure, but, on the contrary, they negligently participated and proceeded therein and erected the work, not only involving the weakness and defects indicated by

the plans, but they allowed the work to proceed in an unworkmanlike manner in the respects aforesaid, and otherwise of like character; and the said defendants having charge of the concrete roofing should have protested against the plans adopted for such heavy roof upon such frail support, and against putting any roof thereon until strengthened, but, on the contrary, they negligently participated in the work, and constructed the roof, involving the defects and dangers indicated by the plans and specifications, and otherwise dangerous and defective, not only in the ingredients themselves and their proportions and combinations, and the material was not placed and spread with due care, nor at a proper height or position, in the steel panel frames of the roof beams, and the metallic straps imbedded in the concrete were allowed to become disordered, out of place, and loosened from their supports upon said steel beams while spreading said concrete, leaving the same in a weak and insecure situation; and it was the duty of the roofers, defendants, not to overload said roof, but they negligently did so by making said concrete too thick and heavy, which weight, together with the temporary supports of scantling and plank, rested for several weeks upon the frail structure, causing it to gradually sag, warp, and twist out of place, tending to an ultimate collapse. Some of the temporary supports to the roofing were weak and defective, causing the panels to sag, break, and drop, and thus, and by prematurely removing some of the temporary supports, and using great force therein with blows of iron sledges, said toppling, frail structure, which was already in the process of collapsing, was shaken, precipitated to the ground, as aforesaid. But the plaintiff avers the defects in the trusses alone, as aforesaid, were sufficient, and already tending thereto, independent of the other defects herein set forth, to have caused the collapse of the building and plaintiff's injury, as aforesaid, had the other defects not contributed thereto; and he avers the same in reference to the defects in the superstructure above the trusses; and he avers the same in reference to the concrete roofing, its methods of construction, temporary supports, and the removal thereof; and he avers the same with regard to the brick walls and the defects therein, and of the supports and anchoring therein.

"And the said plaintiff, who had been and was at the time engaged in the work of wiring for electric lighting,

was, without neglect on his part, with due care, upon the premises, and had not been warned and was unaware of the impending danger; and when the said structure collapsed and fell he was, by means of the premises, and of the various defects as aforesaid, wounded and injured, and sustained damages as in said first count alleged.

"Fourth Count. And for that whereas, the said proprietors negligently proceeded to erect a building as in said last count mentioned, and negligently adopted the defective plans as therein mentioned, and negligently had the work carried forward in the defective and negligent manner and upon those defective plans as in said last count stated; and the plaintiff avers also that defendant J. M. Wood assumed to be a competent, reliable, and experienced architect and engineer in the construction of theaters and buildings of the class proposed, and was engaged to, allowed to, and did participate as associate architect in the preparation of said plans, and in the direction, carrying forward, and the supervision of the work so carried on as in the last count set forth; and it was the duty of said Wood to have exercised care and skill both in the preparation and adoption of said plans and specifications, and to see that they were perfect and safe, and next also to see that the work in all its parts was properly and safely executed, so as to make a safe construction; and that the like duty rested upon John Scott & Co., defendants, associate architects with said Col. Wood; that the said proprietors retained control over them, and they were acting as agents for said proprietors and said enterprise, as were all the other defendants; and as such agents, in so carrying forward the respective parts of the work as in said last count mentioned, they were all guilty of negligence as in said last count stated, respectively, together with the said defendant Wood, as herein stated, contributing to the catastrophe and the injury herein complained of, by which neglect of said architects, engineers, and artisans the said principal defendants were bound as principals; and by reason of the premises, and the said wrongful and negligent misconduct on the part of said defendants, the plaintiff was, at the time and place aforesaid, in the manner aforesaid, wounded and injured as aforesaid, in the ways and manners and to the extent aforesaid, to his damage of $10,000; and therefore he brings suit."

Among the reasons assigned for demurring to the declaration are: *First*, that it does not charge the de-

fendants with the commission of a joint wrong; *second*, that it does not state a cause of action. It is said plaintiff is averred to be dead, and, though it may be inferred from what follows that he is living, that inference from facts alleged cannot prevail over matter positively alleged. It is also said there is no positive averment of the nature of the respective estates of Moore, Wiggins, Schmitt, and Scherer. It is also said: "Several tort feasors, not acting in concert, or by unity of design, are not liable to a joint action for damages, although the consequences of the several torts have united to produce an injury to the plaintiff." *Miller* v. *Ditch Co.*, 87 Cal. 430 (25 Pac. 550, 22 Am. St. Rep. 254); *Chipman* v. *Palmer*, 77 N. Y. 51 (33 Am. Rep. 566); *Blaisdell* v. *Stephens*, 14 Nev. 17 (33 Am. Rep. 523); *Keyes* v. *Water Co.*, 53 Cal. 724.

There can be no doubt but the cases cited sustain the last proposition stated by counsel, but we do not think they show the demurrer should be sustained. The declaration is not a model of good pleading. Many of the sentences are involved, many of the statements might be much more clear and terse than they are. We do not, however, think the declaration can be read without reaching the conclusion that what the pleader meant by what he averred was that, when the roof and walls fell in, many who were engaged upon the roof and about the premises were killed, some were wounded, and that plaintiff at the same time, and from the same cause, received injuries which he afterwards described in detail. While the declaration does not show very clearly the respective shares of the premises owned by each of the defendants Moore, Wiggins, Schmitt, and Scherer, it does show that the four owned the premises, and proposed to erect a theater thereon, and then goes on in detail to describe what was done, and with what result. We also think it shows that each of the defendants who have demurred to the declaration contributed to the one catastrophe which resulted in the injury for which plaintiff has brought suit, and that it states

wrongs for which a joint action for damages will lie. Cooley, Torts, 78; *Slater* v. *Mersereau*, 64 N. Y. 138; *Olson* v. *Manufacturing Co.*, 103 Wis. 337 (79 N. W. 409); *Atkinson* v. *Transportation Co.*, 60 Wis. 141 (18 N. W. 764, 50 Am. Rep. 352), and many cases there cited.   See, also, *Wilkinson* v. *Spring Works*, 73 Mich. 405 (41 N. W. 490); *Barnowsky* v. *Helson*, 89 Mich. 523 (50 N. W. 989, 15 L. R. A. 33).

The judgment is reversed, and the case remanded, with leave to defendants to plead to the declaration within 20 days after service of notice.

The other Justices concurred.